IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| DANIEL PUCKET, in his own capacity; AMY PUCKET, in her own capacity; LUKE PUCKET, by and through his parents and guardians, Daniel and Amy Pucket; BENJAMIN PUCKET, by and through his parents and guardians, Daniel and Amy Pucket, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civ. No. 03-5033-KES |
| HOT SPRINGS SCHOOL DISTRICT NO. 23-2; and its SCHOOL BOARD, | ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | |
| LAWRENCE LONG, in his official capacity as Attorney General of South Dakota; and MARK BARNETT, in his official capacity as Chief Deputy Attorney General of South Dakota, | ) ) ) ) ) ) | |
| Intervenor Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

Anthony R. Picarello, Jr., Esq.
Derek L. Gaubatz, Esq.
Roger T. Severino, Esq.
THE BECKET FUND FOR RELIGIOUS
 LIBERTY
1350 Connecticut Avenue, NW
Suite 605
Washington, DC  20036-1735
202-349-7203

Daniel F. Duffy, Esq.
Jeffrey G. Hurd, Esq.
BANGS, MCCULLEN, BUTLER, FOYE &
 SIMMONS
P.O. Box 2670
Rapid City, SD  57709-2670
605-343-1040

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION..................................................................................................1

SUMMARY JUDGMENT STANDARD ..............................................................1

SUMMARY OF UNDISPUTED MATERIAL FACTS..........................................1

ARGUMENT ......................................................................................................5

I.     From July 2002 Until May 2003, the School District Had a Policy or Custom of Excluding Bethesda Lutheran Students from Government Busing Services Based on the School District's Own Interpretation of the South Dakota Constitution. ......................................................................................................5

II.    The School District's Policy or Custom of Excluding Plaintiffs from Government Busing Services Violated Multiple, Overlapping, Federal Constitutional Protections Against Religious Discrimination. ...................7

    A.    The School District's Application of the State Blaine Amendments to Deny Plaintiffs Busing Violates the Equal Protection Clause.........................7

        1.    The Equal Protection Clause forbids government from employing religion-based classifications to serve any end, and from pursuing the end of hostility to disfavored religious denominations. ......................................................................................8

        2.    The School District's application of the State Blaine Amendments in this case both employs a religious classification and enforces historic animus against "sectarian" schools................11

           a.    The text of the State Blaine Amendments reflects their discriminatory purpose. .........................................................12

           b.    The history of the State Blaine Amendments confirms their discriminatory purpose ...................................................13

           c.    The School District applied the State Blaine Amendments to discriminatory effect in this case..........................................18

    B.    The School District's Application of the State Blaine Amendments to Deny Plaintiffs Busing Violates the Free Exercise Clause. ..........................19

        1.    The State Blaine Amendments that the School District applied here fail the requirement of religious neutrality................................19

         **a.**    **The text of the State Blaine Amendments is not neutral.**.......**20**

         **b.**    **The actual operation of the State Blaine Amendments confirms their lack of neutrality.**...............................................**21**

         **c.**    **All other historical factors further confirm that the State Blaine Amendments lack neutrality.**.......................................**22**

      **2.**    **The School District's application of the State Blaine Amendments in this case forces Plaintiffs to choose between observance of their religious beliefs and receipt of a government benefit.**.....................................................................................**23**

   **C.**    **The School District's Application of the State Blaine Amendments to Deny Plaintiffs Busing Violates the Free Speech Clause.**............................**23**

   **D.**    **The School District's Application of the State Blaine Amendments to Deny Plaintiffs Busing Violates the Establishment Clause.**.........................**24**

**CONCLUSION** ...............................................................................................................**25**

## INTRODUCTION

For well over ten years, Hot Springs School District No. 23-2 (the "School District" or "District") provided public busing services to all pre-college students within the District, without regard to religion. Then, for what turned out to be a year, students were denied busing if the school they attended was "sectarian." The School District's change in policy was based on its interpretation of South Dakota's infamous "Blaine Amendments" — a product of Nineteenth Century hostility to religious outsiders — giving effect in the present day to the Amendments' original, religion-based hostility. Because that policy violates federal constitutional guarantees against religious discrimination, it should be struck down. And because there are no genuine issues of material fact, it should be struck down on this motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings and evidence on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). To prevail on summary judgment, the movant bears the burden to prove that no genuine issues of material fact exist. *Gateway, Inc.* v. *Companion Products, Inc.*, 320 F. Supp. 2d 912 (D.S.D. 2002) (Schreier, J.). "Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists." *Id.* (citing *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242 (1986)).

## SUMMARY OF UNDISPUTED MATERIAL FACTS

Because of space constraints in this brief, Plaintiffs rely primarily on their separate Statement of Undisputed Fact to provide a detailed account, complete with citations to

supporting evidence, of the undisputed material facts that warrant summary judgment for Plaintiffs.  *See* LR 56.1(B).  Plaintiffs provide only a brief summary of those facts here.

In 1889, South Dakota ratified as part of its first constitution Article VIII, Section 16 and Article VI, Section 3, provisions that the state has retained to this day without modification.  SoF ¶ 38.  Article VIII, Section 16 provides:

> No appropriation of lands, money or other property or credits to aid any ***sectarian*** school shall ever be made by the state, or any county or municipality within the state, nor shall the state or any county or municipality within the state accept any grant, conveyance, gift or bequest of lands, money or other property to be used for ***sectarian*** purposes, and no ***sectarian*** instruction shall be allowed in any school or institution aided or supported by the state.

S.D. CONST. art. VIII § 16 (emphasis added).  Similarly, Article VI, Section 3 of the South Dakota Constitution provides in relevant part:  "No money or property of the state shall be given or appropriated for the benefit of any ***sectarian*** or religious society or institution."  S.D. CONST. art. VI § 3 (emphasis added).

These provisions represent one instance of a broader trend at the time among the states – primarily in the new western states, but also farther east – to pass constitutional provisions that targeted certain religious groups for disfavor.  Specifically, the laws imposed special burdens on religious groups that resisted the "common faith" of non-denominational Protestantism taught in the "common schools" of the time, in part to assimilate growing numbers of immigrants.  SoF ¶¶ 7, 11, 13, 16-18.  The provisions accomplished this purpose by prohibiting public funds from flowing to the schools of these denominations, and by prohibiting the influence of those denominations in the schools that received public funds.  SoF ¶¶ 13, 16, 21, 28, 34.  The distinguishing mark of these laws was their use of the term "sectarian" to target the disfavored religious groups:  the term was critical, because it was intended and understood ***not*** to hamper the free flow of government funds to "nonsectarian" religious teaching in the public schools.

2

SOF ¶¶ 21, 35.  Instead, the term "sectarian" referred initially to the Protestant denominations whose doctrines fell outside the "nonsectarian" mainstream, and later – as European immigration exploded – to Catholicism as well.  SoF ¶¶ 7-11, 23, 26, 27, 31.

After laws like this were added to several state constitutions, a federal version was proposed as a constitutional amendment by Congressman James G. Blaine, in part to build support for his bid for the Republican nomination for President in 1876 by harnessing the widespread anti-Catholic sentiment of the day.  SoF ¶¶ 13-15, 19-21.  Blaine's amendment was very popular, so even after it failed by a narrow margin to obtain the necessary super-majority in the Senate, the idea found expression in subsequent laws.  SoF ¶¶ 22, 26, 32, 35.  Among these were the federal Enabling Acts that required new states, as a condition of admittance to the Union, to include a provision like the federal Blaine Amendment in their state constitutions. State laws like these are commonly called "Blaine Amendments."  *See* Lauck Decl. ¶ 15; Glenn Dep. 116 (Severino Ex. 1).

Article VIII, Section 16 and Article VI, Section 3 – included in South Dakota's constitution because of the Enabling Act – are South Dakota's Blaine Amendments and are the laws at issue here.  SoF ¶ 37.  They have been applied in this case by the School District to deny public school busing to students attending precisely the kind of denominational school that the Amendments were originally passed to harm.  SoF ¶¶ 41, 68, 71.

Specifically, from July 2002 to May 2003, the District pursued a policy or custom of interpreting the South Dakota Blaine Amendments to deny publicly-funded school busing to Plaintiffs (and other students) attending Bethesda Lutheran School.  SoF ¶ 71.  Although the District had previously provided public busing to Bethesda students for as many as 15-20 years, the District decided to stop in July 2002.  SoF ¶ 65; Order of Apr. 12, 2006, at 2 (Dkt. No. 153).

On October 31, 2002, the District requested an opinion from the South Dakota Attorney General as to whether busing Bethesda students violated the State Blaine Amendments. *Id.* The Attorney General provided its non-binding response on November 6, 2002, directing the District to S.D. ATT'Y GEN. OP. 92-04, which opined that providing busing to students of a sectarian school would violate the State Blaine Amendments. *Id.* Following receipt of the letter, the District passed a motion on December 9, 2002, more formally prohibiting the busing of Bethesda students. *Id.* The motion stated that the District "will not allow Bethesda Lutheran School Students bus service because it has been declared unconstitutional by the South Dakota Attorney General and the loss of the district catastrophic insurance coverage if bus service is provided." SoF ¶ 79.

On February 28, 2003, the District's insurance provider informed the District that busing Bethesda students would not have any effect on the District's liability insurance. Order of Apr. 12, 2006, at 3. And on March 3, 2003, SDCL 13-29-2 was enacted into law, which provided the District even clearer statutory authority to bus Bethesda students. *Id.*; SoF ¶ 88. At around the same time, School District officials were warned again that a lawsuit would be filed unless busing was restored, and Plaintiffs waited almost two more months for the School District to act before filing that suit. SoF ¶¶ 86, 90. The District continued to deny Bethesda students under its interpretation of the State Blaine Amendments until May 16, 2003, after the Complaint was filed on April 23, 2003. SoF ¶¶ 90; Order of Apr. 12, 2006, at 4.

## ARGUMENT

I.      **From July 2002 Until May 2003, the School District Had a Policy or Custom of Excluding Bethesda Lutheran Students from Government Busing Services Based on the School District's Own Interpretation of the South Dakota Constitution.**

A municipality may be held liable under § 1983 where the action that is alleged to be unconstitutional implements a "custom" or "policy" of the municipality. *Monell* v. *Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978). A municipal custom exists if the following three requirements are met:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, *i.e.,* [proof] that the custom was the moving force behind the constitutional violation.

*Mettler* v. *Whitledge,* 165 F.3d 1197, 1205 (8th Cir. 1999) (internal quotations omitted). An "[o]fficial policy involves a deliberate choice to follow a course of action made from various alternatives by an official who maintains the final authority to establish governmental policy." *Jane Doe A* v. *Special Sch. Dist.,* 901 F.2d 642, 645 (8th Cir. 1990) (internal citations and quotations omitted).

Here, it is undisputed that from July 2002 until May 2003, the District ***continuously*** and consistently prohibited Bethesda Lutheran students from riding District buses. SoF ¶¶ 68, 71. This prohibition ***persisted*** over that entire period, despite ongoing efforts by Plaintiffs and others to have busing restored. SoF ¶¶ 70-72. The School District Superintendent and the School Board had ***notice*** as of March 2002 that busing would be denied at the beginning of the 2002-2003 school year. SoF ¶ 67. With this knowledge, the School Board did not act to stop the ban, and Superintendent Hagedorn even took steps to help implement the ban. SoF ¶ 67. The District's continuous and persistent denial of busing is precisely what caused ***Plaintiffs' injury***.

SoF ¶¶ 53-63.  Therefore, for the entire period of July 2002 to May 2003, the School District followed the municipal "custom" of denying busing to Bethesda students because they attend a "sectarian" school.

In addition, on December 9, 2002, the School Board passed an official motion declaring that the District "will not allow Bethesda Lutheran School Students bus service because it was declared unconstitutional by the South Dakota Attorney General and the loss of the district catastrophic insurance coverage if bus service is provided."  SoF ¶ 79.  This Court has already concluded that the "School Board's passing of an official motion sets School District policy, and thus, may subject [the] School District to municipal liability."  Order of Apr. 12, 2006, at 7 (Dkt. No. 153).

The School District has claimed that the motion is not "policy" within the meaning of § 1983, because the School District was "merely enforcing state law" by denying busing.  But this Court concluded in response that, although this remains an open question "*prior to* the adoption of SDCL 13-29-1.2" on March 3, 2003, "any contention that School District was merely enforcing state law does not apply to the continued denial *following*" that enactment.  Order of Apr. 12, 2006, at 9 (emphasis added).  Therefore, there is no issue of fact on the "merely enforcing state law" question after March 3, 2003, and the School District was applying its own policy as a matter of law from that date forward.

This Court also concluded, without specifying a time-frame, that "[t]here is a factual dispute over what caused School District to ban busing," specifically whether the potential loss of insurance played a substantial role in the denial.  Order of Apr. 12, 2006, at 2-3.  But it is undisputed that "[o]n February 28, 2003, School District's insurance provider sent an email to School District stating that busing Bethesda students would no longer have any effect on School

District's liability insurance." *Id.* at 3.  It is also undisputed that the School District did not restore busing to Bethesda students until May 16, 2003, almost 80 days after receiving notice that insurance was no longer an issue, and only after the School District was sued. *Id.* at 4. Therefore, although there may be an issue of fact as to whether insurance played a role in the School District's denial of busing before February 28, that factor drops out of the equation as a matter of law after that date.

Putting it all together, although there may be disputes of fact on the existence or content of the School District's busing policy before March 3, 2003, there are no factual disputes on those issues after that date.  As of then, insurance is no longer a factor, and "mere enforcement of state law" is no longer a factor – both as a matter of law.  Therefore, the Court should enter summary judgment for Plaintiffs to the effect that, at least for the period from March 3 to May 16, 2003, the School District had a policy or custom of denying busing to students at "sectarian" schools based on its own interpretation (as opposed to its alleged non-discretionary execution) of the State Blaine Amendments (as opposed to its alleged insurance considerations).

II.     **The School District's Policy or Custom of Excluding Plaintiffs from Government Busing Services Violated Multiple, Overlapping, Federal Constitutional Protections Against Religious Discrimination.**

A.      **The School District's Application of the State Blaine Amendments to Deny Plaintiffs Busing Violates the Equal Protection Clause.**

The School District's excluding the Puckets from school busing because they attend a "sectarian" school denies them the "equal protection of the laws," U.S. CONST. amend. XIV, § 1, in at least two respects.  First, the decision employs the suspect classification of religion, which

triggers (and fails) strict scrutiny.[1]  Second, the decision serves an illegitimate government

purpose, which fails even rational basis scrutiny.

> 1.    The Equal Protection Clause forbids government from employing religion-based classifications to serve any end and from pursuing the end of hostility to disfavored religious denominations.

The Equal Protection Clause ordinarily requires laws to be "rationally related to a

legitimate state interest."  *City of Cleburne* v. *Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440

(1985).  Though deferential, this minimum standard of rationality is "'not a toothless one.'"

*Schweiker* v. *Wilson,* 450 U.S. 221, 234 (1981) (quoting *Mathews* v. *Lucas,* 427 U.S. 495, 510

(1976)).  Specifically, laws are not "rationally related to a legitimate state interest" when a

plaintiff shows **either** that the government's purpose is not "legitimate," **or** that the government's

chosen means to serve even a legitimate purpose is not "rationally related" to it.  *Cleburne,* 473

U.S. at 440, 446-47.

Thus, for example, government action fails rational basis scrutiny for lack of a legitimate

government interest where the government's purpose is "'a bare ... desire to harm a politically

unpopular group.'"  *Romer* v. *Evans,* 517 U.S. 620, 634 (1996) (quoting *Dept. of Agriculture* v.

*Moreno,* 413 U.S. 528, 534 (1973)); *Cleburne,* 473 U.S. at 446-47.  Similarly, "mere negative

attitudes, or fear," are also illegitimate government purposes.  *Id.* at 448.  *See also Batra* v. *Bd. of*

---

[1]    Defendants will fail, as a matter of law, in any attempt to satisfy strict scrutiny, because they will be unable to meet their burden to prove that their suspect classification serves a "compelling government interest."  *Republican Party of Minn.* v. *White,* 536 U.S. 765, 774-75 (2002) ("Under the strict-scrutiny test, [defendants] have the burden to prove that the [challenged action] is (1) narrowly tailored, to serve (2) a compelling state interest.").  The only arguable compelling interest would be the avoidance of an ***actual*** Establishment Clause violation.  *See, e.g., Peter* v. *Wedl,* 155 F.3d 992, 997 (8th Cir. 1998) (rejecting compelling interest defense where government action was not necessary to avoid Establishment Clause violation).  *See also Good News Club* v. *Milford Central School,* 533 U.S. 98, 112-13 (2001) (avoiding Establishment Clause violation "may be" a compelling interest).  But the Supreme Court long ago found that providing public busing on equal terms to students at religious and nonreligious schools alike does not violate the Establishment Clause.  *See Everson* v. *Bd. of Ed of Ewing Tp.,* 330 U.S. 1 (1947).

*Regents of Univ. of Nebraska,* 79 F.3d 717 (8th Cir. 1996) (law violates the equal protection clause if it "'was a spiteful effort to "get" [plaintiff] for reasons wholly unrelated to any legitimate state objective.'") (quoting *Esmail* v. *Macrane,* 53 F.3d 176, 180 (7th Cir. 1995)).[2]

Strict scrutiny applies, however, when the government either employs a suspect classification, or infringes a fundamental constitutional right.  *See Gavin* v. *Branstad,* 122 F.3d 1081, 1089 (8th Cir. 1997) (citing *Cleburne,* 473 U.S. at 440).  "Strict scrutiny is an exacting inquiry, such that 'it is the rare case in which a law survives strict scrutiny.'"  *Republican Party of Minn.* v. *White,* 416 F.3d 738, 749 (8th Cir. 2005) (quoting *Burson* v. *Freeman,* 504 U.S. 191, 211 (1992).  Under this standard, the law is presumed unconstitutional, but the government may overcome this presumption by proving that the classification (or infringement) is "narrowly tailored" to serve a "compelling governmental interest."  *See Republican Party of Minn.,* 416 F.3d at 749; *Gavin,* 122 F.3d at 1089.

Religion, like race, is a suspect classification that triggers strict scrutiny.  *See City of New Orleans* v. *Dukes,* 427 U.S. 297, 303 (1976) (suspect classifications triggering strict scrutiny include "race, religion [and] alienage"); *Fellowship Baptist Church* v. *Benton,* 815 F.2d 485, 497 (8th Cir. 1987) ("Because religion is a fundamental right, any classification of religious groups is subject to strict scrutiny."); *Peter* v. *Wedl,* 155 F.3d 992, 996 (8th Cir. 1998) ("Government discrimination based on religion violates … the Equal Protection Clause of the Fourteenth

---

[2]    Even if the end is legitimate, government means are not "rationally related" to that end if their "relationship to [it] is so attenuated as to render the distinction arbitrary or irrational." *Cleburne,* 473 U.S. at 446-47.  *A fortiori,* the state may not employ means that subvert, rather than advance, the asserted goal.  *See, e.g., Hooper* v. *Bernalillo County Assessor,* 472 U.S. 612, 619-20 (1985) (finding legislation not rationally related to purpose of encouraging Vietnam veterans to settle in New Mexico where legislation might have discouraged some of those veterans from settling there).  Nor may government employ means that treat differently those who are similarly situated in relation to the government's asserted goal.  *See Cleburne,* 473 U.S. at 439 (Equal Protection Clause directs "that all persons similarly situated should be treated alike").

Amendment"); *Native American Council of Tribes* v. *Solem,* 691 F.2d 382, 384 (8th Cir.1982) (reversing dismissal where "the complaint allege[d] a violation of equal protection by means of religious discrimination"). *See also Employment Div.* v. *Smith,* 494 U.S. 872, 886 n.3 (1990) ("Just as we subject to the most exacting scrutiny laws that make classifications based on race, or on the content of speech, we strictly scrutinize governmental classifications based on religion.") (citations omitted).

Regardless of the level of scrutiny, an equal protection plaintiff must show "an element of intentional or purposeful discrimination." *Batra,* 79 F.3d at 721. Although an illegitimate purpose or a suspect classification is occasionally apparent on the face of a law, more often courts must look "to other sources of circumstantial and direct evidence of intent, such as the historical background of Congress's decision, the specific sequence of events preceding the decision, departures from the normal procedural sequence, substantive departures, and legislative or administrative history." *United States* v. *Carter,* 91 F.3d 1196, 1198 (8th Cir. 1996) (citing *Village of Arlington Heights* v. *Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 266-68 (1977)). For example, in *Hunter* v. *Underwood,* 471 U.S. 222, 229 (1985), the Court found sufficient evidence of discriminatory purpose in the form of "proceedings of the [constitutional] convention, several historical studies, and the testimony of two expert historians". Plaintiffs need only show that the impermissible purpose or intent was "a 'substantial' or 'motivating' factor behind enactment of the law," not the only factor. *Hunter,* 471 U.S. at 228 (quoting *Mt. Healthy City Bd. of Educ.* v. *Doyle,* 429 U.S. 274, 287 (1977)). This showing shifts the burden to the defenders of the law to show that the law would have passed absent the discriminatory factor. *Id.*

In addition, as the Supreme Court explained in *Hunter* v. *Underwood,* where a law was passed for a discriminatory purpose long ago, the law is still unconstitutional in the present day when it is applied to discriminatory effect.  The plaintiffs in *Hunter* challenged a provision of the Alabama Constitution passed in 1901 that disqualified from voting anyone who had been convicted of "any … crime involving moral turpitude."  *Hunter,* 471 U.S. at 223 (quoting ALA. CONST. art. VII § 182).  Although this provision was neutral on its face with respect to race, plaintiffs had proven by historical evidence that race was at least a "motivating" factor in the passage of the law, and the government failed to prove in response that the provision would have passed in the absence of this impermissible motive.  *Id.* at 228-32.  The government then argued that the original, discriminatory motive of Section 182 should be ignored because 80 years had passed, and the law should be evaluated instead as if it had been passed in the present day, apart from its original motive.  *Id.* at 232-33.  But the Court refused to undertake that inquiry, concluding instead that Section 182 "still violates equal protection under *Arlington Heights,*" because "its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect."  *Id.*

> 2.    The School District's application of the State Blaine Amendments in this case both employs a religious classification and enforces historic animus against "sectarian" schools.

As discussed above, the School District denied Plaintiffs busing pursuant to a policy or custom based on the School District's own interpretation of two provisions of the South Dakota Constitution, Article VIII, Section 16 and Article VI, Section 3.  Those constitutional provisions are discriminatory by their plain language; the history and circumstances of their passage serve only to confirm the discrimination apparent from the text; and their application in the present day has the effect of enforcing the original, discriminatory purpose of the law.  Therefore, under any equal protection standard, the denial of busing is unconstitutional.

     a.    <u>The text of the State Blaine Amendments reflects their discriminatory purpose</u>. Article VIII, Section 16 and Article VI, Section 3 both contain the term "sectarian," and both employ it to describe the kind of "school," "purpose," "instruction," "society," or "institution" that will bear a legal disadvantage, *i.e.,* exclusion from government aid. *See* S.D. CONST. art. VIII § 16; art. VI § 3. The term "sectarian" is not synonymous with "religious" but instead refers to a narrower subcategory, connoting one or more "sects" or "denominations" of religion. For example, "nonsectarian prayer" is unmistakably religious but is not tied to any one religious sect. *See, e.g., Lee* v. *Weisman,* 505 U.S. 577, 581-82, 588-89 (1992). The term "sectarian," moreover, has a pejorative meaning, as the School District's own definition of "sectarian" confirms. *See* SoF ¶ 7 (School District defining sectarian to mean "of or relating to a sect or sects, narrow-minded and ready to quarrel over petty differences of opinion"). *See also* William Safire, "Is It Sectarian Violence, Communal Fighting or Civil War?" *New York Times* (Apr. 9, 2006) ("Sectarian is a word long associated with religion that has a nastier connotation than its synonym denominational.").

     Thus, standing alone, the bare term "sectarian" in the South Dakota Constitution both draws a religion-based distinction between those who receive and do not receive government aid, and indicates a government purpose to deny government aid to some disfavored subset of all religious persons or groups. *See Peter,* 155 F.3d at 996 ("'A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense.'") (quoting *Romer,* 517 U.S. at 633); *Nat. Am. Council of Tribes,* 691 F.2d at 384 ("Where one faith is more heavily restricted than another, the courts must closely scrutinize the reasonableness of any restriction.").

*See also Romer,* 517 U.S. at 634 ("a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest").

      b.    <u>The history of the State Blaine Amendments confirms their discriminatory purpose</u>.  Although the distinction between "sectarian" and "religious" may occasionally be blurred in common usage today, it was not when the South Dakota Constitution first became law. SoF ¶ 31 (Glenn Dep. 44:42-49).  Indeed, the historical context of Article VIII, Section 16 and Article VI, Section 3 makes clear that their use of the term "sectarian" was not an oversight or a matter of mere semantics, but instead a common legal device to target for special disadvantage those who resisted the "common religion" then taught in the "common schools."  SoF ¶¶ 11, 16, 21, 28-31, 35.  In other words, the meaning of "sectarian" can best be understood by reference to the "nonsectarian" religion to which it was opposed at the time.  SoF ¶¶ 16, 23-24.

      Specifically, the term "sectarian" both expressed and implemented hostility to the faiths of those immigrants (especially, but not only, Catholics) who resisted assimilation to the "nonsectarian" Protestantism then taught as the "common faith" in the "common schools." Denying aid only to "sectarian" schools allowed the government to continue funding the teaching of the government's preferred "nonsectarian" faith through the public schools, while penalizing financially those who resisted that faith.  SoF ¶¶ 21, 28, 29, 35.  In other words, state constitutional provisions that de-funded "sectarian" groups were not designed to implement benign concerns for the separation of church and state traceable to the founding, but instead to target for special disadvantage the faiths of the religious minorities of the late 19th Century – especially the religions of immigrants, and especially Catholicism.  SoF ¶¶ 6, 12.

This basic history of the meaning of "sectarian" as a legal term has been confirmed in opinions of the U.S. Supreme Court written or joined by six current Justices.[3]  In *Mitchell v. Helms,* 530 U.S. 793 (2000), a plurality of four Justices acknowledged and condemned the religious bigotry that gave rise to the state laws that targeted "sectarian" faiths, commonly called "Blaine Amendments."  *See id.* at 828-29 (plurality opinion of Thomas, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ.).  The opinion criticized the Court's prior use of the term "sectarian" in Establishment Clause jurisprudence, because "hostility to aid to pervasively sectarian schools has a shameful pedigree that we do not hesitate to disavow."  *Id.* at 828.  The opinion continued:

> Opposition to aid to "sectarian" schools acquired prominence in the 1870s with Congress' consideration (and near passage) of the Blaine Amendment, which would have amended the Constitution to bar any aid to sectarian institutions.  Consideration of the amendment arose at a time of pervasive hostility to the Catholic Church and to Catholics in general, and it was an open secret that "sectarian" was code for "Catholic."  *See generally* Green, *The Blaine Amendment Reconsidered,* 36 AM. J. LEGAL HIST. 38 (1992).

*Mitchell,* 530 U.S. at 828.  The plurality concluded that "the exclusion of pervasively sectarian schools from otherwise permissible aid programs" – the very purpose and effect of the state constitutional provisions here – represented a "doctrine, born of bigotry, [that] should be buried now."  *Id.* at 829.

In *Zelman v. Simmons-Harris,* 536 U.S. 639 (2002), three Justices provided a detailed account of the relevant history in dissent.  *See id.* at 720-21 (dissenting opinion of Breyer, J., joined by Stevens and Souter, JJ.).  Not only did they recognize that the Blaine Amendment movement was a form of backlash against "political efforts to right the wrong of discrimination

---

[3]     The two opinions at issue encompass the votes of seven Justices, but Chief Justice Rehnquist has since passed away.

against religious minorities in public education," they explained how the term "sectarian"

functioned within that movement.  *Id.* at 721.

> [H]istorians point out that during the early years of the Republic, American schools –
> including the first public schools – were Protestant in character.  Their students recited
> Protestant prayers, read the King James version of the Bible, and learned Protestant
> religious ideals.  *See, e.g.,* D. Tyack, *Onward Christian Soldiers:  Religion in the
> American Common School, in History and Education* 217-226 (P. Nash ed. 1970).  Those
> practices may have wrongly discriminated against members of minority religions, but
> given the small number of such individuals, the teaching of Protestant religions in schools
> did not threaten serious social conflict.

*Zelman,* 536 U.S. at 720.  The Justices recounted how the wave of immigration starting in the

mid-19th Century increased the number of those suffering from this discrimination, and

correspondingly the intensity of religious hostility surrounding the "School Question":

> Not surprisingly, with this increase in numbers, members of non-Protestant religions,
> particularly Catholics, began to resist the Protestant domination of the public schools.
> Scholars report that by the mid-19th century religious conflict over matters such as Bible
> reading "grew intense," as Catholics resisted and Protestants fought back to preserve their
> domination.  Jeffries & Ryan, [*A Political History of the Establishment Clause*, 100
> MICH. L. REV. 279,] 300 [(Nov. 2001)] "Dreading Catholic domination," native
> Protestants "terrorized Catholics."  P. Hamburger, *Separation of Church and State* 219
> (2002).  In some States "Catholic students suffered beatings or expulsions for refusing to
> read from the Protestant Bible, and crowds ... rioted over whether Catholic children could
> be  released from the classroom during Bible reading."  Jeffries & Ryan, 100 MICH. L.
> REV., at 300.

*Zelman,* 536 U.S. at 720-21.  Finally, the Justices detailed how Catholic efforts to correct this

increasingly severe discrimination elicited a reaction in the form of the proposed federal Blaine

Amendment and its successful state progeny:

> Catholics sought equal government support for the education of their children in the form
> of aid for private Catholic schools.  But the "Protestant position" on this matter, scholars
> report, "was that public schools must be 'nonsectarian' (which was usually understood to
> allow Bible reading and other Protestant observances) and public money must not support
> 'sectarian' schools (which in practical terms meant Catholic.)"  [Jeffries & Ryan] at 301.
> And this sentiment played a significant role in creating a movement that sought to amend
> several state constitutions (often successfully), and to amend the United States
> Constitution (unsuccessfully) to make certain that government would not help pay for

"sectarian" (*i.e.,* Catholic) schooling for children. [Jeffries & Ryan] at 301-305. *See also* Hamburger, *supra,* at 287.

*Zelman,* 536 U.S. at 721. To be sure, the Justices in these two opinions differed on the legal consequences of these historical facts, but they still agreed on those facts.

That judicial agreement reflects that the weight of scholarly authority in support of this account of the historical meaning and usage of the term "sectarian" is nothing short of crushing: it is documented in numerous law review articles[4] and books,[5] and confirmed in the report and testimony of Plaintiffs' expert Dr. Charles L. Glenn, *see* Glenn Decl.; Glenn Dep. (Severino Decl. Ex. 1), and elsewhere throughout Plaintiffs' separate Statement of Facts. *See* SoF ¶¶ 5-22.

---

[4]      *See, e.g.,* Lupu, *The Increasingly Anachronistic Case Against School Vouchers,* 13 NOTRE DAME J.L. ETHICS & PUB. POL'Y 375, 386 (1999) ("From the advent of publicly supported, compulsory education until very recently, aid to sectarian schools primarily meant aid to Catholic schools as an enterprise to rival publicly supported, essentially Protestant schools."); Laycock, *The Underlying Unity of Separation and Neutrality,* 46 EMORY L.J. 43, 50 (1997) ("Although there were legitimate arguments made on both sides, the nineteenth century opposition to funding religious schools drew heavily on anti-Catholicism."). *See generally* DeForrest, *An Overview and Evaluation of State Blaine Amendments: Origins, Scope, and First Amendment Concerns*, 26 HARV. J. L. & PUB. POL'Y 551 (Spring 2003); Duncan, *Secularism's Laws: State Blaine Amendments and Religious Persecution,* 72 FORDHAM L. REV. 493, 508-509 (2003); Green, *The Blaine Amendment Reconsidered,* 36 AM. J. LEGAL HIST. 38 (1992); Heytens, Note, *School Choice and State Constitutions*, 86 VA. L. REV. 117 (2000); Jeffries & Ryan, *A Political History of the Establishment Clause*, 100 MICH. L. REV. 279 (Nov. 2001); Viteritti, *Blaine's Wake:  School Choice, the First Amendment, and State Constitutional Law,* 21 HARV. J. L. & PUB. POL'Y 657 (1998)

[5]      *See, e.g.,* PHILIP HAMBURGER, SEPARATION OF CHURCH AND STATE 335 (Harvard Univ. Press, 2002) ("Nativist Protestants also failed to obtain a federal constitutional amendment but, because of the strength of anti-Catholic feeling, managed to secure local versions of the Blaine amendment in the vast majority of the states."); *See generally* RAY A. BILLINGTON, THE PROTESTANT CRUSADE, 1800-1860: A STUDY OF THE ORIGINS OF AMERICAN NATIVISM (1938); CHARLES L. GLENN, JR., THE MYTH OF THE COMMON SCHOOL (U. Mass. 1988); LLOYD JORGENSON, THE STATE AND THE NON-PUBLIC SCHOOL, 1825-1925 (1987); CARL F. KAESTLE, PILLARS OF THE REPUBLIC: COMMON SCHOOLS AND AMERICAN SOCIETY, 1780-1860, at 3 (1983); PAUL KLEPPNER, THE CROSS OF CULTURE: A SOCIAL ANALYSIS OF MIDWESTERN POLITICS, 1850-1900 (1970); WARD M. MCAFEE, RELIGION, RACE AND RECONSTRUCTION:  THE PUBLIC SCHOOL IN THE POLITICS OF THE 1870S (S.U.N.Y. 1998); JOHN T. MCGREEVY, CATHOLICISM AND AMERICAN FREEDOM (2003); DIANE RAVITCH, THE GREAT SCHOOL WARS:  NEW YORK CITY, 1805-1973, at 50-52 (1974); WILLIAM G. ROSS, FORGING NEW FREEDOMS:  NATIVISM, EDUCATION, AND THE CONSTITUTION 1917-1927 (1994); JOSEPH P. VITERITTI, CHOOSING EQUALITY:  SCHOOL CHOICE, THE CONSTITUTION, AND CIVIL SOCIETY (Brookings 1999).

Importantly, the particular provisions of the South Dakota Constitution at issue in this case fit squarely within this broader national trend. SoF ¶ 35. South Dakota used the legal term "sectarian" in the same discriminatory fashion – not as a ***forerunner*** to the federal Blaine Amendment (like Massachusetts) but as a ***successor*** of it. SoF ¶¶ 32-35. A few years after the federal Amendment barely failed, Congress passed a series of Enabling Acts to admit western states into the Union, including South Dakota. *Id.* Those Acts set conditions for admittance, including requiring the new states to establish "systems of public schools … free from sectarian control," and forbidding the states from using public school lands, or the funds from their sale, to aid "sectarian" schools. Act of Feb. 22, 1889, 25 Stat. 676, ch. 180, § 4, ¶ Fourth; § 14 (1889) (Enabling Act for South Dakota and three other states). The legislative history of the Act confirms what its text already indicates – that the purpose of these legislative requirements was to accomplish retail what Blaine's constitutional amendment failed to accomplish wholesale. *See* 20 CONG. REC. 2100-01 (1889) (statement of Sen. Blair) (praising failed Blaine Amendment and discussing the importance of preserving "nonsectarian" Protestantism in the common schools, while excluding "sectarian" doctrine, and supporting Enabling Act for that purpose).

South Dakota, in turn, ratified Article VIII, Section 16 and Article VI, Section 3, which both contain the key term "sectarian," and combine to forbid both "sectarian" control of publicly funded schools, and public funding of "sectarian" schools. *See* S.D. Const. art. VIII § 16; art. VI § 3. And in South Dakota, as elsewhere throughout the country at the time, the public schools were still quite religious, teaching the "nonsectarian" faith of non-denominational Protestantism. SoF ¶¶ 28-30. Thus, these two state constitutional provisions were not designed to serve the government purpose of rendering the public schools secular. SoF ¶¶ 21, 28-30, 35. Instead, they manifested and implemented the government's purpose to favor the "nonsectarian" faith, and to

disfavor its "sectarian" rivals, by funding the former and de-funding the latter. SoF ¶¶ 16, 28, 35. Once again, this historical account specific to South Dakota is further supported and detailed by existing scholarship, by the report and testimony of Plaintiffs' expert Dr. Jon K. Lauck, *see* Lauck Decl.; Lauck Dep. (Severino Decl. Ex. 25), and by additional evidence set forth in Plaintiffs' separate Statement of Facts. *See* SoF ¶¶ 23-39.

In sum, all of these provisions – the federal Blaine Amendment, the Enabling Act, and the consequent South Dakota provisions – embody the same pincer attack that governments nationwide applied to religious outsiders of the mid- to late 19th Century: establish and fund public schools to teach the homogenizing "nonsectarian" faith, but cut off funding for those religious groups that insist on their denominational peculiarities strongly enough to leave the public schools and start their own (*i.e.,* the "sectarians"). *See* Steven E. Green, *The Blaine Amendment Reconsidered,* 36 AM. J. LEGAL HIST. 38, 72 (1992) ("The Blaine Amendment came about in response to two related controversies: the public funding of sectarian education and the issue of religious exercises in the public schools."). Far from the benign practice (which dates back to the founding) of avoiding government funding of clergy training, *see Locke,* 540 U.S. at 723 n.5 ("the only interest at issue here is the State's interest in not funding the religious training of clergy"), this is bald government hostility (which dates back little more than 125 years) to certain religious denominations – mostly Catholics, but more broadly, those united by their opposition to the religious viewpoint established in the public schools. SoF ¶¶ 9, 25-27. This is both an illegitimate government purpose, and an impermissible religion-based classification. Both violate the Equal Protection Clause.

c.    The School District applied the State Blaine Amendments to discriminatory effect in this case. The School District has applied the South Dakota constitution here to deny a

government educational benefit to students at precisely the kind of "sectarian" school that the Blaine Amendments targeted when they were passed. Bethesda Lutheran School would have been a prime target of the Blaine Amendments. SoF ¶ 31; Glenn Dep. 123:17-127:6 (Severino Decl. Ex. 1) (Lutherans considered "sectarian"). And from the outset, these amendments were applied in South Dakota to disadvantage Protestant denominational schools, as well as Catholic ones. *See Synod of Dakota* v. *State,* 2 S.D. 366, 50 N.W. 632, 633 (1891) (applying Blaine Amendments to block state payment for tuition to Pierre University, because it was a school "of the sect known as 'Presbyterians.'"). *See also id.* at 635 ("That the Pierre University is a sectarian school or institution, within the meaning of these provisions of the constitution, is not seriously controverted.").

Thus, the School District's application of the Blaine Amendments in the present day has the ***effect*** of disadvantaging precisely the kind of "sectarian" school that the law was ***intended*** to disadvantage, rendering that application unconstitutional. *See* Dist. Int. Resp. No. 4 (Severino Decl. Ex. 14) (unable to "distinguish the Bethesda Lutheran school from the Court's description of Pierre University" as "sectarian"); Glenn Dep. 123:17-127:6. In other words, because the "original enactment [of the state Blaine Amendments] was motivated by a desire to discriminate against ["sectarian" schools] on account of [religion] and the section continues to this day to have that effect" by denying busing to students at just such a "sectarian" school, those amendments "still violate[] equal protection under *Arlington Heights.*" *Hunter,* 471 U.S. at 233. For all these reasons, this Court should grant Plaintiffs summary judgment on Count I.

### B. The School District's Application of the State Blaine Amendments to Deny Plaintiffs Busing Violates the Free Exercise Clause.

1. The State Blaine Amendments that the School District applied here <u>fail the requirement of religious neutrality.</u>

Under the Free Exercise Clause, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral," and it triggers strict scrutiny. *Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah,* 508 U.S. 520, 533 (1993); *Peter,* 155 F.3d at 996-97. Although courts may assess the neutrality of a law in several ways, they "must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Lukumi,* 508 U.S. at 533. If this inquiry is inconclusive, courts may consider other factors, such as "the effect of a law in its real operation[, which] is strong evidence of its object." *Id.* at 535. Failing that, courts may employ an equal-protection like analysis and consider the *Arlington Heights* factors. *Id.* at 540-42. Here, the State Blaine Amendments, which represented "'the only basis'" for the School District's decision to deny the Puckets busing, fail the requirement of neutrality at every step in the analysis.

a.      The text of the State Blaine Amendments is not neutral. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi,* 508 U.S. at 533. That is unmistakably true here, where the laws applied by the School District use the term "sectarian" to distinguish between legally favored and disfavored activities. S.D. CONST. art. VIII § 16; art. VI § 3. If there were some kind of secular meaning for "sectarian," it would simply make no sense in the context of these two provisions – it is beyond reasonable dispute that the "sects" targeted in the South Dakota Constitution are religious ones.

This case is therefore indistinguishable from *Peter* v. *Wedl,* 155 F.3d 992 (8th Cir. 1998). There, the Eighth Circuit applied strict scrutiny to a school district's policy that denied educational benefits to students at private religious schools, but not private nonreligious ones. The policy was based on a state law that "***explicitly*** discriminated against children who attended

private religious schools" by drawing this distinction.  *Peter,* 155 F.3d at 996 (emphasis added). The court did not dig any deeper into the background of the state law to discern its object:  it was enough that the school district had relied on the discriminatory state law in its policy decision, and that the school district believed that the state law prevented it from providing the services. *Id.* at 997.  In *Peter,* as here, this is sufficient to show the lack of neutrality under the Free Exercise Clause.  *See* SoF ¶ 91.

   b. <u>The actual operation of the State Blaine Amendments confirms their lack of neutrality.</u> Although it is unnecessary to examine the actual operation of the State Blaine Amendments to determine their object, that inquiry only underscores the lack of neutrality that is apparent from their language.  As discussed above, *see supra* Section II.A.2.(b), Article VIII Section 16 and Article VI Section 3 operated in tandem to oppress religious minorities that resisted the government's preferred "nonsectarian" faith, *see Lukumi,* 508 U.S. at 535-40 (examining "operation" of challenged laws by discussing interplay among them):  the provisions established and funded public schools where the "nonsectarian" faith was taught freely, while cutting off funds to "sectarian" schools.  *See* SoF ¶¶ 28-30, 35.  The object of these amendments was further confirmed by the decision of the South Dakota Supreme Court, very soon after they were ratified, applying them to deny tuition payments to a non-public college associated with a particular denomination.  *See Synod of Dakota* v. *State,* 2 S.D. 366, 50 N.W. 632, 635 (1891) (finding Pierre University "sectarian").  Around the same time, a public college was instituted with mandatory "nonsectarian" religious exercises.  *See* Severino Decl. Ex. 22 (*Builders of God's Kingdom,* at 89) (public University of Dakota required "all students … to attend chapel services 'where brief and simple religious exercises' were held").

     c.     <u>All other historical factors further confirm that the State Blaine Amendments lack</u> <u>neutrality.</u>  The non-neutral language and operation of the laws at issue simply reflect their discriminatory history.  As discussed above, Article VIII Section 16 and Article VI Section 3 are two among several state-level progeny of the failed federal Blaine Amendment.  *See supra* Section II.A.2.(b) (tracing history of SD provisions through Enabling Act back to federal Blaine).  This "credible connection" to the original Blaine Amendment, *Locke* v. *Davey,* 540 U.S. 712, 723 n.7 (2004), confirms that these provisions were "born of bigotry, [and] should be buried now."  *Mitchell,* 530 U.S. at 829.

     Importantly, this historic connection to the federal Blaine Amendment and its religion-based animus are not necessary for Plaintiffs to prevail under the Free Exercise Clause.  Blaine Amendments are not the only kind of historic, state constitutional amendment that impermissibly target religion for special disfavor.  In *McDaniel* v. *Paty,* 435 U.S. 618 (1978), the Supreme Court struck down a provision of the Tennessee Constitution dating back to 1796 that disqualified any "ministers of the Gospel or priests *of any denomination whatever*" from becoming legislators or participating in the state's constitutional convention.  *Id.* at 621 (emphasis added).  The state provision was not passed out of any bad animus against religion – it did not target any particular disfavored faith or group of faiths, and it was supported by "some of the foremost political philosophers and statesmen of that period," including Thomas Jefferson.  *Id.* at 621-23.  Nonetheless, the Supreme Court found the amendment offensive to the Free Exercise Clause, because the "disqualification operates against McDaniel because of his *status* as a 'minister' or 'priest.'"  *Id.* at 627.  And *McDaniel* is, of course, still good law.  *See Smith,* 494 U.S. at  877 (citing *McDaniel* for the proposition that "government may not … impose special disabilities on the basis of religious views or religious status").

In light of this, even if the laws at issue in this case did not have a "credible connection" to the federal Blaine Amendments (which they do), *see Locke,* 540 U.S. at 723 n.7, or were not passed out of religion-based "animus" (which they were), *see id.* at 725, they would still violate the Free Exercise Clause.  And that is because, even apart from their history, these laws still disqualify Plaintiffs from the government benefit of busing based on religious status.  *Smith,* 494 U.S. at 877; *McDaniel,* 435 U.S. at 627; *see, e.g., Peter,* 155 F.3d at 996-97.

> 2.    The School District's application of the State Blaine Amendments in this case forces Plaintiffs to choose between observance of their religious beliefs and receipt of a government benefit.

In *Locke,* the Supreme Court also reaffirmed that the Free Exercise Clause may be violated where a law requires religious adherents "to choose between their religious beliefs and receiving a government benefit."  *Locke,* 540 U.S. at 720-21 (citing *Hobbie* v. *Unemployment App. Comm'n,* 480 U.S. 136 (1987); *Thomas* v. *Review Bd.,* 450 U.S. 707 (1981); and *Sherbert* v. *Verner,* 374 U.S. 398 (1963)).  According to the undisputed facts in the record, that is exactly the choice that the School District forced on the Puckets over the 2002-2003 school year:  they could either send their children to a "sectarian" school in accordance with their sincerely held religious beliefs, or they could receive the government benefit of school busing.  SoF ¶ 52.  This, too, violates the Free Exercise Clause, and so represents an independently sufficient ground for entering summary judgment for Plaintiffs on Count II of their Complaint.

**C.    The School District's Application of the State Blaine Amendments to Deny Plaintiffs Busing Violates the Free Speech Clause.**

Students within the School District (as elsewhere) who wish to study religion from a devotional perspective may not do so in the public schools.  *Abington Tp.* v. *Schempp,* 374 U.S. 203, 225 (1963) (government schools may not teach religion, but may teach about religion).  If these students do seek education on the topic of religion from a devotional viewpoint, the

government excludes them from school busing, and precisely because their schools are dedicated to that "sectarian" perspective. *See* S.D. CONST. art. VIII § 16; art. VI § 3. Meanwhile, students who are content to study religion, if at all, from a secular perspective continue to enjoy access to the School District's buses. As in *Good News Club* v. *Milford Central School,* 533 U.S. 98 (2001), this exclusion from school facilities based on the students' religious perspective represents viewpoint discrimination that violates the Free Speech Clause. *See also Smith,* 494 U.S. at 877 ("The government may not … impose special disabilities on the basis of religious views"). Therefore, summary judgment should be entered for Plaintiffs on Count III.

### D.     The School District's Application of the State Blaine Amendments to Deny Plaintiffs Busing Violates the Establishment Clause.

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson* v. *Valente,* 456 U.S. 228, 244 (1982). As a close corollary, the "Establishment Clause … forbids an official purpose to disapprove of a particular religion or of religion in general." *Lukumi,* 508 U.S. at 532. The South Dakota Blaine Amendments were designed to accomplish exactly what these Establishment Clause principles forbid: to reflect and enforce the government's purpose to prefer the "nonsectarian" faith of lowest-common denominator Protestantism, and correspondingly, to disapprove the "sectarian" faiths that resisted the government's preferred faith. SoF ¶¶ 16, 28-30, 35. And those Amendments were applied in this case so that they reflect and enforce that same official disapproval, by denying busing to students at Bethesda Lutheran, a "sectarian" school. Plaintiffs are therefore entitled to summary judgment on Count IV.

## **CONCLUSION**

For all the above reasons, Plaintiffs summary judgment motion should be granted.

Dated:  November 15, 2006

                THE BECKET FUND FOR RELIGIOUS LIBERTY


By:     */s/ Jeffrey G. Hurd*
        Daniel F. Duffy, Esq.
        Jeffrey G. Hurd, Esq.
        BANGS MCCULLEN, BUTLER, FOYE &
        SIMMONS
        333 West Boulevard, Suite 400
        P.O. Box 2670
        Rapid City, SD  57709-2670
        Phone:  (605) 343-1040
        Fax:  (605) 343-1503

        -  and -

        Anthony R. Picarello, Jr., Esq.
        Derek L. Gaubatz, Esq.
        Roger T. Severino, Esq.
        1350 Connecticut Avenue, NW, Suite 605
        Washington, DC  20036-1735
        Phone:  (202) 955-0095
        Fax:  (202) 955-0090

        *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he served this legal document upon the persons herein next designated, all on the date below shown, by electronic means pursuant to Fed.R.Civ.P 5(b)(2)(D) to:

Roxanne Giedd
Diane Best
Jeffrey P. Hallem
Attorney General's Office
500 E. Capitol
Pierre, SD  57501-5070

Judith K. Grunewaldt
Tieszen Law Office, L.L.P.
306 East Capitol, Suite 300
P.O. Box 550
Pierre, SD  57501-0550

which are the last addresses of the addressees known to the subscriber.

Dated this 15th day of November, 2006.

*/s/ Jeffrey G. Hurd*
Jeffrey G. Hurd, Esq.

*This document was electronically filed.*