UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| DANIEL PUCKET, in his own capacity; AMY PUCKET, in her own capacity; LUKE PUCKET, by and through his parents and guardians, Daniel and Amy Pucket; BENJAMIN PUCKET, by and through his parents and guardians, Daniel and Amy Pucket, | ) ) ) ) ) ) ) ) ) | Civ.  03-5033-KES |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| HOT SPRINGS SCHOOL DISTRICT NO. 23-2, and its SCHOOL BOARD, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| LAWRENCE LONG, in his official capacity as Attorney General of South Dakota, and MARK BARNETT, in his official capacity as Chief Deputy Attorney General of South Dakota, | ) ) ) ) ) ) | |
| Intervenor Defendants. | ) | |

Civ.  03-5033-KES

ORDER GRANTING
SUMMARY JUDGMENT

Plaintiffs filed an action under 42 U.S.C. § 1983 against defendants Hot

Springs School District No. 23-2 and its School Board (collectively referred to

as School District).  Plaintiffs allege that School District's termination of

busing of students to and from Bethesda Lutheran School (Bethesda) violates

the First and Fourteenth Amendments of the United States Constitution.

Plaintiffs contend that School District unconstitutionally deprived them of busing because School District interpreted two provisions of the South Dakota Constitution (collectively referred to as the S.D. Constitution provisions) as prohibiting busing.  Intervenors, Lawrence Long and Mark Barnett (collectively referred to as State), intervened to defend the constitutionality of the S.D. Constitution provisions.  Pending are cross-motions for summary judgment.  For the reasons discussed below, the court grants School District's and State's motions for summary judgment.

## FACTUAL BACKGROUND

Plaintiffs are students and parents of students who attended Bethesda, a sectarian elementary school located within the Hot Springs School District, during the 2002-2003 school year.  For at least ten years prior to the 2002-2003 school year, School District provided bus transportation to students attending Bethesda.  School District only picked up Bethesda students who resided along existing school bus routes.

On March 21, 2002, School District received a letter from Arthur J. Gallagher & Co., the administrator for School District's automobile liability insurance policy.  (Docket 302-3).  In the letter, Linda R. Joski, an account executive for Arthur J. Gallagher & Co., informed School District that "[i]t has come to our attention that Hot Springs School District is transporting children for a local parochial school."  Id.  Joski informed School District that this was

2

not "school sponsored" activity, and thus, it was beyond the scope of School District's policy. Id. Arthur J. Gallagher & Co. asked School District to discontinue busing students to Bethesda as soon as possible and no later than the beginning of the 2002-2003 school year.

In early April of 2002, Neal Wynia, a bus driver for School District and also a Bethesda school board member, told Beth Spitzer, the principal of Bethesda, that there was a problem with School District's busing of Bethesda students. (Docket 379, at ¶ 4). Spitzer called School District's superintendent Vern Hagedorn. (Docket 379, at ¶ 5). Hagedorn told Spitzer that School District's insurance company told School District to stop busing Bethesda students. (Docket 302-5, at 4). Hagedorn indicated that busing would continue through the end of the 2001-2002 school year. Id.

During April and May of 2002, there were a series of communications between Spitzer, School District's business manager Bill Lynch, and School District's insurance provider. In these communications, Spitzer provided copies of Bethesda's automobile insurance coverage to School District's insurance provider. (Docket 302-5, at 1).

In July of 2002, the Association of School Boards received an opinion letter from its counsel (who also was counsel for School District) regarding the legality of busing Bethesda students. (Docket 302-24). According to counsel, S.D. Att'y Gen. Op. 92-4 indicated that school boards cannot provide busing

to students who attend private, parochial schools.  Counsel thus opined that an insurance company might take the position that there is no coverage for buses that simultaneously transport public and nonpublic school students. School District received a copy of this letter by fax.  (Docket 302-5).  Later in July, School District decided to ban busing of Bethesda students.  Id.  This prevented Bethesda students, including plaintiffs, from riding School District's buses to school for most of the 2002-2003 school year.

In mid-July 2002, Spitzer contacted attorney Rollyn Samp.  Samp suggested that Bethesda students' parents sign a release and indemnification provision to eliminate the insurance issue.  (Docket 384-5).  Spitzer informed Hagedorn about Samp's suggestions.  (Docket 302-5, at 2).  Spitzer also suggested an indemnification agreement as a possible solution to Joski. (Docket 379, at ¶ 22).  Spitzer informed Bethesda's school board on August 5, 2002, that the indemnification agreement was a possible solution to the problem.

On August 9, 2002, Joski wrote an email to employees at Arthur J. Gallagher & Co. inquiring whether School District would have coverage if it provided busing to students of a parochial school as a gesture of goodwill. (Docket 302-33).  Joski indicated that School District would require both the parochial school and the students' parents to sign a "Hold Harmless/Indemnification Agreement"  Id.  Mark Stanbury of Arthur J.

4

Gallagher & Co. responded on August 12, 2002, that the "underwriters do not necessarily have a large problem with this as long as [School District] is being adequately protected." (Docket 302-34). The underwriters wanted to see the completed agreement before providing coverage, however. Joski then faxed School District, informed it of the underwriter's decision, and sought a copy of the indemnification agreement. (Docket 302-35).

On August 19, 2002, a week before school was scheduled to begin, Hagedorn called Spitzer to inquire about the indemnification agreement. (Docket 379, at ¶ 42). The same day Hagedorn sent Spitzer a letter that enclosed the indemnification agreement. Id. Spitzer informed Bethesda Lutheran Church Council the next day that there were two solutions to the busing problem: (1) an indemnification agreement, or (2) a lawsuit against South Dakota. (Docket 302-43). School began in late August of 2002, and plaintiffs were not allowed to ride the bus to and from Bethesda. (Docket 379, at ¶ 49).

On September 5, 2002, Lynch called Joski and they discussed the need for the underwriters' approval. (Docket 379, ¶ 51). That same day, Joski emailed Stanbury of Arthur J. Gallagher & Co. and inquired whether the underwriters had had an opportunity to review the indemnification agreement that she had sent. (Docket 302-17). In response, Stanbury indicated that "underwriters are agreeable to the contractual arrangement between [School

District] and [Bethesda] for the transportation of private school students" so long as the underwriters receive both proof of adequate insurance and executed copies of the indemnification agreement.  (Docket 302-19).  Stanbury also indicated that the underwriters were concerned that the South Dakota Attorney General "ha[d] called the legality of this operation into question," which would create an additional risk of liability.  Joski faxed this information to School District and requested the verification of insurance as well as copies of the executed indemnification agreements on September 17, 2002, and again on September 30, 2002.  (Docket 302-18; Docket 302-19).  Joski then emailed the request to School District's counsel on October 1, 2002.  (Docket 302-21).

On October 31, 2002, School District requested a formal opinion by the South Dakota Attorney General on whether busing Bethesda students violated state law.  (Docket 379, at ¶ 58).  The Attorney General issued a letter on November 6, 2002, and directed School District to S.D. Att'y Gen. Op. 92-04, in which the Attorney General opined that school boards lacked statutory authority to simultaneously provide busing to public school students and students attending sectarian, private schools.  (Docket 302-23, 45).  The Attorney General also opined that even if such an arrangement was allowed

by statute, the busing of students by a school district to a sectarian school would violate art. VI, § 3,[1] and art. VIII, § 16,[2] of the S.D. Constitution.  Id.

On December 9, 2002, School District held a school board meeting. Spitzer spoke at the meeting and introduced herself as "representing the Bethesda Lutheran School Board and Bethesda Lutheran School parents." (Docket 302-47).  During the meeting, multiple members of the School District's school board indicated a desire to continue busing Bethesda students.  (Docket 379, at ¶ 91).  There is a factual dispute regarding whether Spitzer asked for the reinstatement of busing.  It is undisputed, however, that Spitzer asked at least five times for an official motion to deny busing.  (Docket 379, at ¶ 94).  School District's school board adopted a motion stating: "The district would not allow Bethesda Lutheran School students bus service because it was declared unconstitutional by the South Dakota Attorney

---

[1] Article VI, § 3 provides in pertinent part:

No money or property of the state shall be given or appropriated for the benefit of any sectarian or religious society or institution.

[2] Article VIII, § 16 provides:

No appropriation of lands, money or other property or credits to aid any sectarian school shall ever be made by the state, or any county or municipality within the state, nor shall the state or any county or municipality within the state accept any grant, conveyance, gift or request of lands, or other property to be used for sectarian purposes, and no sectarian instruction shall be allowed in any school or institution aided or supported by the state.

General and the loss of the district catastrophic insurance coverage if bus service is provided." (Docket 302-47, at 9).

On January 22, 2003, School District offered to Beth Spitzer that it would help sponsor legislation to fix the denial of busing to Bethesda students. (Docket 302-50). On February 24, 2003, Senate Bill 244 passed 34-0 in the South Dakota Senate. (Docket 379, at ¶ 110-11). The next day, Senate Bill 244 passed 69-0 in the South Dakota House of Representatives. (Docket 379, at ¶ 118). It was signed into law by the governor on March 3, 2003, and became effective immediately because it contained an emergency clause. (Docket 379, at ¶ 122). Senate Bill 244 was codified at SDCL 13-29-1.2, which provides:

> School districts may provide transportation to nonpublic school students if no additional public funds are expended to provide the transportation. No school district, however, is required under this section to provide transportation to nonpublic school students. This section does not affect the transportation of any eligible student pursuant to an individualized education plan.

On February 25, 2003, Spitzer met with Hagedorn and informed him that three parents of Bethesda students were going to sue School District. (Docket 302-25, at 9). Hagedorn asked what this would accomplish in light of the impending adoption of SDCL 13-29-1.2. Id. Hagedorn offered to reinstate busing during this meeting.

On February 28, 2003, anticipating enactment of SDCL 13-29-1.2, School District's insurance provider sent an email to School District stating

8

that busing Bethesda students would no longer have any effect on School District's liability insurance.  (Docket 379, at ¶ 121).

On April 23, 2003, plaintiffs filed a complaint alleging that 42 U.S.C. § 1983 had been violated by depriving busing to Bethesda students.  School District reinstated busing for Bethesda students on May 16, 2003.  (Docket 361, at ¶ 92).

### STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56.  Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.  The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct.

9

2548, 91 L. Ed. 2d 265 (1986).  The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980).  The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

## DISCUSSION

Plaintiffs argue that they are entitled to monetary damages and declaratory relief under 42 U.S.C. § 1983 because School District violated the U.S. Constitution when it terminated the busing of Bethesda students.  Before reaching the constitutional issues, the court must determine whether plaintiffs have Article III standing.

## I.   Article III Standing

"Federal courts must determine that they have jurisdiction before proceeding to the merits."  Lance v. Coffman, 127 S. Ct. 1194, 1196, 167 L. Ed. 2d 29 (2007).  Article III limits a federal court's subject matter jurisdiction to "actual cases and controversies," and thus, the court lacks subject matter jurisdiction to entertain an action unless the plaintiff has Article III standing. McClain v. Am. Economy Ins. Co., 424 F.3d 728, 731 (8th Cir. 2005).  "To show Article III standing, a [party] has the burden of proving: (1) that he or

she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." Steger v. Franco, Inc., 228 F.3d 889, 892 (8th Cir. 2000). "'The party invoking federal jurisdiction bears the burden of establishing these elements.'" Young Am. Corp. v. Affiliated Computer Servs. (ACS), Inc., 424 F.3d 840, 843 (8th Cir. 2005) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).

In evaluating whether plaintiffs have standing, it is important to focus on the precise nature of their claim. Plaintiffs do not argue that there is a general constitutional right to busing, and thus, School District must provide busing to all students, including those that attend private schools. Nor do plaintiffs argue that it is unconstitutional to provide busing only to students attending public schools while refusing to bus students attending private schools. Instead, plaintiffs argue that once the government provides busing benefits to some students that attend private schools, it cannot discriminate against those students who attend religious private schools. Plaintiffs argue that use of the word "sectarian" in the S.D. Constitution provisions facially discriminates against private, religious schools, even though SDCL 13-29-1.2 permits the busing of students to private schools.

State argues that plaintiffs lack standing to contest the constitutionality of the S.D. Constitution provisions because School District lacked authority to

bus students to private schools irrespective of the S.D. Constitution provisions. Specifically, State contends that School District could not simultaneously transport both public school students and nonpublic school students to their respective schools. State thus argues that a finding that the S.D. Constitution provisions violate the U.S. Constitution would not redress plaintiffs' injury-in-fact—the denial of busing—because there was a separate, unchallenged basis for denying busing.

"[S]chool boards are creatures of statute with limited powers. Therefore, a school board cannot exercise power unless it is expressly granted or necessarily implied by statute." In re Writ of Certiorari as to Wrongful Payments of Attorney Fees Made by Brookings Sch. Dist. Sch. Bd., 668 N.W.2d 538, 542 (S.D. 2003). When exercising powers necessarily implied from a statute,

> "the implication . . . should be clear and undoubted, and the party claiming through [it] should be able to point [it] out with certainty and precision. . . . Mere general arguments drawn from the convenience of possessing a power under certain circumstances in case of emergency–conclusions that, if possessed, it might be beneficially exercised, are very dangerous sources of corporate authority. . . . Implications spring from the necessities of some power actually conferred, and not from notions of what would be convenient or expedient under particular circumstances."

Id. at 542-43 (quoting State ex rel. Bell v. Bd. of County Comm'rs of Beadle County, 300 N.W. 832 (S.D. 1941)) (omissions and alterations in original).

Determining the scope of a school board's authority is an act of statutory construction.  "[A]ny power sought to be exercised must be found within the four corners of the statute under which they proceed." <u>Sunnywood Common Sch. Dist. No. 46 of Minnehaha, County v. County Bd. of Educ. of Minnehaha County</u>, 131 N.W.2d 105, 110 (S.D. 1964).  In interpreting a state statute, the court begins with the plain language of the statute and tries to " 'ascertain the intent of the legislature by looking at the language of the statute itself and giving it its plain, ordinary and commonly understood meaning.' " <u>In re M & S Grading, Inc.</u>, 457 F.3d 898, 901 (8th Cir. 2006) (quoting <u>Johnson v. Methorst</u>, 110 F.3d 1313, 1315 (8th Cir. 1997)); <u>see also Loesch v. City of Huron</u>, 723 N.W.2d 694, 697 (S.D. 2006).  The court may also look at other statutes governing the same subject matter in an effort to determine legislative intent.  <u>See Loesch</u>, 723 N.W.2d at 697.  If the court must resort to rules of construction to ascertain the legislature's intent, statutes conferring powers to school boards are strictly construed because school boards have no inherent powers.  <u>See Oleson v. Town of Hurley</u>, 691 N.W.2d 324, 328 (S.D. 2004).  "However, other rules of statutory construction may also apply when looking to the statutory grant of authority." <u>Id.</u>

In analyzing School District's authority to bus plaintiffs, the court divides School District's denial of busing to plaintiffs into two separate periods.  The first period is the denial of busing from August 2002 until

13

March 3, 2003, when SDCL 13-29-1.2 became effective.  The second period is

from March 3, 2003, until May 16, 2003, when School District reinstated

busing.

**A.     First Period—August 2002 to March 3, 2003**

Plaintiffs argue that School District was authorized to simultaneously

bus public and nonpublic students by SDCL 13-24-20, which states in

relevant part:

> The school board may rent or grant the use of school
> facilities, motor vehicles or land belonging to the school district
> for any purposes which it considers advisable as a community
> service for such compensation as it determines. . . .  The use may
> not interfere with school activities.  Any person or persons or
> public body using such school facilities, motor vehicles or land is
> responsible to the school district for any and all damages that
> may be caused by reason of the use or occupancy.  The school
> district is not liable for any suit for damages which might arise as
> the result of such use or occupancy.

Alternatively, plaintiffs contend that School District was authorized by SDCL

13-29-1.1, which states:

> A school board may allow nonprofit civic organizations or
> other government entities to use vehicles owned by the school
> district to transport persons to various activities deemed by the
> school board to be in the public interest.  A school board may
> adopt policies for the use of its vehicles by other organizations.

In response, State contends that SDCL 13-24-20 and 13-29-1.1

empowered school districts to give or rent their vehicles to nonprofit

organizations with the nonprofit providing a driver to operate the vehicle.

State argues that this is different from empowering the school district to have

its school bus drivers pick up nonpublic school students at home and transport them to a nonpublic school as a part of the driver's bus route. Instead, State argues that prior to adoption of SDCL 13-29-1.2 on March 3, 2003, School District's authority to transport students from home to school was solely governed by SDCL 13-29-1, which states in relevant part:

> The school board of any school district may acquire, own, operate, or hire buses for the transportation of students to and from its schools either from within or without the district or for transportation to and from athletic, musical, speech, and other interscholastic contests in which participation is authorized by the school board. . . .

As an initial matter, the court concludes that SDCL 13-29-1 does not provide authority for School District to bus plaintiffs from their home to Bethesda. This statute authorizes school boards to transport students in two limited instances. First, when transporting students "to and from its schools." SDCL 13-29-1 (emphasis added). Because School District does not own Bethesda, this sentence does not apply. The second instance allows schools to transport students "to and from athletic, musical, speech, and other interscholastic contests . . . ." Id. This sentence does not apply to the daily transportation to and from school.

The court also agrees with School District that neither SDCL 13-24-20 nor 13-29-1.1 grants School District authority to transport plaintiffs to and from home to nonpublic schools. Both SDCL 13-24-20 and 13-29-1.1 empower school boards to grant or allow others, including nonprofit

15

organizations, to "use" the school board's motor vehicles.  "Use" is defined as "to put into action or service."  <u>Webster's Third New International Dictionary</u> 2523 (15th ed. 1969); <u>see also</u> <u>The Oxford Essential Dictionary</u> 663 (1998) (defining use as "cause to act or serve a purpose; bring into service").  The ordinary meaning of the word "use" indicates that SDCL 13-24-20 and 13-29-1.1 only apply when the nonprofit is actually driving or operating one of the school district's motor vehicles.  <u>See</u> <u>McIntyre v. Wick</u>, 558 N.W.2d 347, 362 (S.D. 1996) ("Legislative intent is derived from the plain, ordinary and popular meaning of statutory language." (internal quotation omitted)).

Plaintiffs contend that "use" by a nonprofit, nonpublic school enables nonpublic school students to ride on buses operated by drivers hired by the school board.  This broad interpretation of "use," however, is inconsistent with the strict construction that is to be given to statutes granting authority to school boards.  <u>See</u> <u>Oleson</u>, 691 N.W.2d at 328.  It is also inconsistent with the language used by the legislature in other statutes governing busing, namely SDCL 13-29-1 and 13-29-1.2.  SDCL 13-29-1 empowers the school board to transport public school students to and from school.  Further, SDCL 13-29-1.2, which was adopted on March 3, 2003, empowered, in certain circumstances, the school board to transport nonpublic school students to and from school.  Notably, neither of these statutes include the word "use." Instead, in each instance, the act of carrying students from their home to

16

school is referred to as "transportation."  If the legislature intended SDCL 13-24-20 or 13-29-1.1 to empower the school board to carry students to and from home to nonpublic schools, it would have expressed that intent by including the word "transportation" in either SDCL 13-24-20 or 13-29-1.1. Instead, the legislature chose the word "use," indicating that neither of these statutes permit the school board to carry students from home to a nonpublic school.

Finally, the legislature's adoption of SDCL 13-29-1.2 indicates that neither SDCL 13-24-20 nor 13-29-1.1 empowered school boards to transport students to and from nonpublic schools.  SDCL 13-29-1.2 explicitly gave school boards this power.  If, however, as plaintiffs contend, school boards already had this power based upon either SDCL 13-24-20 or 13-29-1.1, then there was no reason for the legislature to adopt SDCL 13-29-1.2.  In determining the legislature's intent, the court presumes that "[t]he legislature does not intend to insert surplusage in its enactments."  Nat'l Farmers Union Prop. & Cas. Co. v. Universal Underwriters Ins. Co., 534 N.W.2d 63, 65 (S.D. 1995); see also Revier v. Sch. Bd. of Sioux Falls Sch. Dist. #49-5, 300 N.W.2d 55, 57 (S.D. 1980), amended on other grounds by 304 N.W.2d 699 (1981).

In sum, the court concludes that neither SDCL 13-24-20 nor 13-29-1.1 empowered school boards, including School District, to transport nonpublic

students to and from home to nonpublic schools.[3]  Additionally, SDCL 13-29-1 only empowered school boards to transport students to and from home to public schools.  The court thus concludes that School District had no legal authority to transport plaintiffs to Bethesda prior to March 3, 2003.  Because School District lacked authority to provide busing to Bethesda students, plaintiffs cannot show that School District's alleged discrimination caused their injury-in-fact.  See Wilson v. Glenwood Intermountain Props., Inc., 98 F.3d 590, 593 (10th Cir. 1996) (holding plaintiffs lacked Article III standing to contest discriminatory denial of benefits because they did not qualify for the benefits based on other lawful, nondiscriminatory requirements); see also 13 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3531.5, at 452 ("Causation is most easily rejected when a plaintiff challenges the denial of a benefit on one ground, and it is shown that the plaintiff is in any event ineligible for the benefit on some other ground."). See also Wilson, 98 F.3d at 593 ("[A] person who fails to satisfy lawful, nondiscriminatory requirements or qualifications for the benefit lacks standing to raise claims of discrimination in the denial of benefits.").  Thus,

---

[3] State also cites S.D. Op. Att'y Gen. 92-04, where the S.D. Attorney General opines, among other things, that the school boards lack authority to transport students to and from nonpublic schools.  The court gives this opinion no weight, however, because the subsequent repeal of the two statutes discussed in the opinion undermines the attorney general's reasoning.

plaintiffs' lack standing to contest the constitutionality of the denial of busing before March 3, 2003.

### B.      Second Period—March 3, 2003, through May 16, 2003

After March 3, 2003, School District was authorized to provide busing to plaintiffs pursuant to SDCL 13-29-1.2, which states:

> School Districts may provide transportation to nonpublic school students if no additional public funds are expended to provide the transportation.  No school district, however, is required under this section to provide transportation to nonpublic school students.  This section does not affect the transportation of any eligible student pursuant to an individualized education plan.

Although School District could now transport plaintiffs to Bethesda, it did not reinstate busing until May 16, 2003.  Plaintiffs allege that School District refused to reinstate busing because they attended a private, parochial school, which amounts to unconstitutional discrimination.  Plaintiffs have Article III standing to challenge School District's denial of busing from March 3, 2003, until May 16, 2003.  Plaintiffs have presented evidence of an injury-in-fact, namely the denial of busing.  They also have presented evidence that but for School District's allegedly unconstitutional policy, they would have received this benefit.  Finally, a finding of discrimination likely would remedy their injury-in-fact because they would be entitled to damages under § 1983.  The court thus proceeds to consider the merits of plaintiffs' § 1983 claim regarding the continued denial of busing after March 3, 2003.

19

## II.    Public Policy or Custom

The rules governing municipal liability apply whenever a plaintiff asserts a § 1983 claim against a school district.  See Lee v. Pine Bluff Sch. Dist., 472 F.3d 1026, 1029 (8th Cir. 2007).  The school district "may not be held vicariously liable for the unconstitutional acts of employees."  Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999).  Instead, municipal liability attaches "where 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the school district's] officers.'"  Kuha v. City of Minnetonka, 365 F.3d 590, 603 (8th Cir. 2004) (quoting Monell v. Dep't of Social Servs. of City of N.Y., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)).  "Official policy involves a 'deliberate choice to follow a course of action . . . made from among various alternatives' by an official who has the final authority to establish government policy."  Jane Doe A ex rel. Jane Doe B v. Special Sch. Dist. of St. Louis County, 901 F.2d 642, 646 (8th Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S. Ct. 1292, 1300, 89 L. Ed. 2d 452 (1986)) (omission in original).  The school district's policy must be " 'the moving force [behind] the constitutional violation.' "  Russell v. Hennepin County, 420 F.3d 841, 848 (8th Cir. 2005) (quoting Mettler, 165 F.3d at 1204).

Here, School District argues that lack of insurance, not a School District policy, was the motivating factor behind denial of busing.  In response, plaintiffs argue that School District adopted an official policy to deny busing.  The court agrees.  As the court indicated in its previous order dated January 17, 2006, School District's school board passed an official motion terminating busing on December 9, 2003.  (Docket 121).  Plaintiffs allege that they were denied their constitutional rights by the enforcement of this policy.  By March 3, 2003, both the insurance and state law barriers to busing had been removed.  School District was aware of these facts.  Yet, busing was not reinstated until May 16, 2003, after School District revoked its previous policy.  As a result, viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could find that School District's policy was a moving force in the continued deprivation of busing during the period of March 3, 2003, through May 16, 2003.   Thus, at a minimum, plaintiffs have presented evidence establishing a genuine issue of fact regarding whether the termination of busing was pursuant to an official School District policy, thereby triggering municipal liability under § 1983.

## III.    Constitutionality of School District's Policy

Plaintiffs allege that School District's policy or custom of continuing to deny busing from March 3, 2003, to May 16, 2003, violated the following

provisions of the U.S. Constitution: (A) the Free Exercise Clause; (B) the Equal Protection Clause; (C) the Free Speech Clause; and (D) the Establishment Clause.  Before determining the constitutionality of School District's policy or custom, however, the court must determine whether there is a genuine issue of material fact as to what motivated the School District's policy or custom of denying busing to Bethesda students after March 3, 2003.  Plaintiffs allege that School District adopted a policy of denying busing because busing was prohibited by the S.D. Constitution provisions.  Plaintiffs thus argue that the court must determine whether the S.D. Constitution provisions violate the United States Constitution.  In response, School District and State dispute whether School District continued to deny busing because School District was enforcing the S.D. Constitution provisions.

Viewing the evidence in the light most favorable to plaintiffs, the court concludes that no reasonable jury could find that School District continued to deny busing after March 3, 2003, because it was enforcing the S.D. Constitution provisions.  The undisputed evidence indicates that beginning on January 22, 2003, School District offered to help sponsor legislation that would authorize it to provide busing to Bethesda students.  (Docket 302-50; Docket 379, at ¶ 104).  Additionally, School District's attorney contacted Spitzer to determine whether Bethesda was interested in promoting the legislation.  (Docket 302-5, at 8).  On February 24, 2003, the South Dakota

Senate voted 34-0 to pass Senate Bill 244, which added SDCL 13-29-1.2 to authorize busing of students to nonpublic schools.  (Docket 379, at ¶ 111). On February 25, the same bill was approved 69-0 by the South Dakota House of Representatives.  (Docket 379, at ¶ 111).  The bill was signed into law by the governor and contained an emergency clause so that it went into effect on March 3, 2003.  If School District thought busing was still prohibited by the S.D. Constitution provisions, it would not have spent the time and effort to promote legislation that would ultimately be deemed unconstitutional.

Furthermore, a conversation between Spitzer and Hagedorn on February 25, 2003, refutes plaintiffs' contention that School District continued to deny busing because it thought busing was prohibited by the S.D. Constitution provisions.  Instead, the conversation indicates that School District was willing to reinstate busing in light of the passage of SDCL 13-29-1.2.  Hagedorn's notes indicated that during this conversation, Spitzer informed Hagedorn that three parents of Bethesda students were going to sue School District.  (Docket 302-25, at 9).[4]  Hagedorn asked her what the lawsuit would accomplish in light of the 34-0 vote by the South Dakota Senate to

---

[4] Plaintiffs contend that Hagedorn's notes are inadmissible hearsay.  The court disagrees.  The notes are not being offered to prove the truth of the statements contained therein, namely that three students intended to sue the School District and that SDCL 13-29-1.2 violated the S.D. Constitution provisions.  See Fed. R. Evid. 801(c).  Instead, the notes are being offered to show that School District did not terminate busing because it chose to enforce the S.D. Constitutional provisions.

23

approve Senate Bill 244 (codified at SDCL 13-29-1.2), and the expectation
that the bill would gain similar approval in the South Dakota House of
Representatives and be signed into law by the governor.  Id.  Hagedorn also
informed Spitzer that School District's insurance provider had already sent a
copy of Senate Bill 244 to the company's underwriters to determine whether
the underwriters would now allow busing of Bethesda students.  Id.
Hagedorn warned Spitzer that the underwriters would charge a surcharge or
rider fee.  Id.  At her deposition, Spitzer testified that Hagedorn presented
Senate Bill 244 as the solution to the busing problem.  (Docket 302-4, at 163-
66).  She informed Hagedorn, however, that Senate Bill 244 did not solve the
problem because it violated S.D. Constitution provisions.  Id.  Spitzer's notes
indicate that Hagedorn said busing would be reinstated on July 1 in light of
Senate Bill 244.  (Docket 302-5).  The testimony of Chuck Benson, a Bethesda
school board member, further verifies that School District was willing to
reinstate busing after Senate Bill 244 was adopted.  (Docket 302-62, at 47-
49).  This evidence all indicates that School District, speaking through
Hagedorn, offered to reinstate busing because School District thought
adoption of Senate Bill 244 would solve the problems preventing busing.

Plaintiffs present no evidence refuting School District's and State's
contention that Hagedorn offered to reinstate busing during the February 25
meeting.  At her deposition, Spitzer specifically testified that she could not

remember, but does not refute, that Hagedorn offered to reinstate busing during this conversation.  (Docket 302-4, at 160-61).  Instead, plaintiffs argue that Spitzer was not their agent, and thus, even if Hagedorn told Spitzer that School District was willing to reinstate busing, he did not communicate this to plaintiffs themselves.  This does not matter.  Regardless of whether Spitzer was plaintiffs' agent, Hagedorn's offer to reinstate busing indicates that School District believed Senate Bill 244 solved the problems preventing busing.  This is inconsistent with plaintiffs' position that School District continued to deny busing after March 3, 2003, because School District thought busing was prohibited by the S.D. Constitution provisions.

School District's offer to reinstate busing was consistent with its practice and custom of busing Bethesda students irrespective of the S.D. Constitution provisions.  The S.D. Constitution provisions have been in effect since the late 1890s.  Nevertheless, the undisputed evidence indicates that School District bused Bethesda students for at least ten years prior to the termination of busing in July of 2002.  (Docket 379, at ¶1).  On March 21, 2002, School District received a letter from its insurance company requesting that it terminate busing Bethesda students "at your earliest convenience but not later than the beginning of the 2002-2003 school year" because this was not "school sponsored" activity, and thus, was beyond the scope of School

District's insurance policy.  (Docket 302-3).[5]  Nevertheless, it is undisputed that School District continued to provide busing to Bethesda students through the end of the 2001-2002 school year.  Additionally, School District reinstated busing on May 16, 2003, and continues to provide busing today even though the S.D. Constitution provisions are still in effect.

The undisputed evidence also indicates that beginning in April of 2002, School District communicated with both Spitzer and School District's insurance company about how they could solve the problems preventing busing.  School District and Spitzer discussed whether an indemnification agreement would solve the problems preventing busing.  (Docket 302-5, at 1, 2; Docket 302-33; Docket 379, at ¶ 42).  Although plaintiffs dispute whether School District's efforts to solve the problems were half-hearted, they do not dispute that these communications occurred.  Even if half-hearted, these efforts indicate that School District terminated busing because it feared loss of insurance coverage, not because it made a policy decision to enforce the S.D. Constitution provisions.

_____

[5] Plaintiffs contend that this and several documents containing communications between School District and its insurance providers are inadmissible hearsay.  The court disagrees.  These documents are not being offered to prove the truth of the matter asserted, namely, that the busing was not "school sponsored" activity.  See Fed. R. Evid. 801(c).  Instead, they are being offered to prove whether School District's motive for terminating busing was enforcement of the S.D. Constitution provisions or the impending denial of insurance coverage.

The foregoing undisputed evidence establishes that no reasonable jury could find that School District continued to deny busing after March 3, 2003, because School District enforced S.D. Constitution provisions.[6]  The constitutionality of the S.D. Constitution provisions is thus not at issue in this case.  Whether the S.D. Constitution provisions are either facially discriminatory or were adopted out of religious animus does not matter because plaintiffs cannot establish a causal link between the S.D. Constitution provisions and the School District policy.  See Locke v. Davey, 540 U.S. 712, 724 n.7, 124 S. Ct. 1307, 1314, 158 L. Ed. 2d 1 (2004) (refusing to consider the history of the Blaine Amendment because plaintiffs failed to establish a connection between the provision at issue in the case and Washington's Blaine Amendment).  Instead, the issue before the court is the

---

[6] In its order dated January 17, 2006, the court previously indicated that there was a question of fact regarding whether the loss of insurance coverage was School District's true motivation for terminating busing.  (Docket 121, at 3).  As an initial matter, the court notes that the question of fact was whether School District terminated busing because of the risk of losing insurance coverage or whether School District terminated busing for some other reason. The court did not consider the issue of whether School District denied busing because it was enforcing the S.D. Constitution provisions.

In any event, this question of fact disappears regarding the continued denial of busing after March 3, 2003.  Although the language of School District's official motion to deny busing might create a question of fact regarding whether it was enforcing S.D. Constitution provisions when it originally denied busing, the undisputed evidence indicates that School District was not enforcing the S.D. Constitution provisions when it continued to deny busing after March 3, 2003.

constitutionality of School District's policy decision to continue denying

busing after March 3, 2003.

**A.    Free Exercise**

Plaintiffs allege that School District's denial of busing violated their

right to free exercise of religion.  The scope of review under the free exercise

clause depends on the law or policy challenged.  "[A] law that is neutral and of

general applicability need not be justified by a compelling governmental

interest even if the law has the incidental effect of burdening a particular

religious practice." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,

508 U.S. 520, 531, 113 S. Ct. 2217, 2226, 124 L. Ed. 2d 472 (1993) (Lukumi)

(citing Employment Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872,

110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990)).  "[I]f the object of a law is to

infringe upon or restrict practices because of their religious motivation, the

law is not neutral, . . ." Id. at 533, 113 S. Ct. 2217.  In other words, a law is

not neutral if the "purpose of a law is the suppression of religion or religious

conduct." Id.  If the law is neutral and generally applicable, then it "need only

be rationally related to a legitimate governmental interest to survive a

constitutional challenge." Grace United Methodist Church v. City of

Cheyenne, 451 F.3d 643, 649 (10th Cir. 2006).

Plaintiffs allege that the S.D. Constitution provisions are facially

discriminatory against religion, and thus, not neutral.  As noted above,

however, School District's policy decision has no connection to the S.D. Constitution provisions.  Further, plaintiffs neither argue nor present evidence indicating that School District adopted its policy or custom of continuing to deny busing after March 3, 2003, because School District wanted to restrict plaintiffs from attending religious schools.  Instead, the evidence indicates that School District historically provided busing and in fact offered to reinstate busing on February 25, 2003.  The court thus finds that no reasonable jury could conclude that School District's policy was not neutral, and thus, rational-basis review applies.

School District's policy of continuing to deny busing after March 3, 2003, satisfies the deferential rational-basis test.  See Citizens for Equal Protection v. Bruning, 455 F.3d 859, 867 (8th Cir. 2006) (describing rational-basis review as "highly deferential").  As noted above, the undisputed evidence indicates that Hagedorn, as a representative of School District, offered to Spitzer to reinstate busing of Bethesda students in light of the adoption of SDCL 13-29-1.2.  Rather than accepting this offer, Spitzer informed Hagedorn that School District was going to be sued regardless.  The rejection of the offer to reinstate busing by Spitzer, who was the superintendent of Bethesda and who had previously appeared on behalf of Bethesda students, is sufficient reason for School District to refuse to reinstate busing.  Further, School District could have rationally refused to act in light of the impending litigation

29

because School District was not able to determine the effect reinstituting busing may have on its potential liability.  Because School District's continued denial of busing is rationally related to a legitimate government interest, plaintiffs' free exercise challenge fails as a matter of law.

Further, even if School District's policy was not facially neutral, the Supreme Court's decision in <u>Locke v. Davey</u>, 540 U.S. 712, 124 S. Ct. 1307, 158 L. Ed. 2d 1 (2004), indicates that the denial of busing is too insignificant of a burden to constitute a free exercise violation.[7]  In <u>Locke</u>, the plaintiff qualified for a state-sponsored scholarship based upon his academic potential and socio-economic status.  According to the statutes governing the program, the scholarship is only available to students who attend colleges within the state of Washington (public or private) and the student cannot pursue a degree in theology.  Although plaintiff otherwise qualified for the scholarship, he wanted to pursue a degree in theology, and thus, the state denied him the scholarship.  The plaintiff then brought suit under § 1983 and argued, among other things, that the denial of the scholarship violated the Free Exercise

---

[7] Plaintiffs argue that the burden on a plaintiff's religion is not relevant whenever the plaintiff is challenging government action that directly targets religion for disfavor.  Instead, plaintiffs argue that the level of burden is only relevant when the free exercise challenge is based upon the burden imposed by a neutral, generally applicable law.  Plaintiffs' argument is inconsistent with <u>Locke</u>, however, where the Supreme Court considered the burden on the plaintiffs' religion even though the statute explicitly targeted religion for disfavor.  See <u>Locke</u>, 540 U.S. at 720, 124 S. Ct. 1307.

Clause.  The plaintiff argued that the scholarship program was not facially

neutral because it funded every major of study except theology.  Plaintiff

argued that this explicit disfavor for religion made the program presumptively

unconstitutional under Lukumi.

The Supreme Court held that the program did not violate the Free

Exercise Clause.  In doing so, the Court explicitly rejected plaintiff's argument

that the program was presumptively unconstitutional under Lukumi.  The

Court refused to extend Lukumi to the facts of Locke because the burden on

religion—the denial of scholarship to fund a theology degree—was too minor.

The Court distinguished the program from other, more significant burdens

that constituted a Free Exercise violation:

> It imposes neither criminal nor civil sanctions on any type of
> religious service or rite.  It does not deny to ministers the right to
> participate in the political affairs of the community.  And it does
> not require students to choose between their religious beliefs and
> receiving a government benefit.

Locke, 540 U.S. at 720-21, 124 S. Ct. at 1312-13 (citations omitted).  The

Court then concluded that the program was constitutional because

Washington state had a substantial interest in not funding devotional degrees.

Plaintiffs contend that Locke is factually limited to cases involving the

funding of clergy training.  The court disagrees.  See, e.g., Eulitt ex rel. Eulitt

v. Maine Dep't of Educ., 386 F.3d 344, 355 (1st Cir. 2004).  In Eulitt, the

plaintiff challenged a statute that permitted Maine to provide tuition payments

for students attending private, nonsectarian schools, but prohibited tuition payments for private, sectarian schools.  The plaintiff, who wanted to use the tuition payments to attend a Catholic high school, attempted to distinguish Locke by limiting its application to cases involving training of the clergy.  The First Circuit disagreed because the court "read Davey more broadly: the decision there recognized that state entities, in choosing how to provide education, may act upon their legitimate concerns about excessive entanglement with religion, even though the Establishment Clause may not require them to do so."  Id.  The First Circuit held that denial of tuition payments did not violate either the Free Exercise Clause or the Equal Protection Clause.  See also Teen Ranch v. Udow, 389 F. Supp. 2d 827, 838 (W.D. Mich. 2005) (relying, among other things, on Locke in finding that policy prohibiting funding of faith-based youth residential center did not violate Free Exercise), aff'd, 479 F.3d 403 (6th Cir. 2007); Bush v. Holmes, 886 So. 2d 340, 362-64 (Fla. Dist. Ct. App. 2004) (en banc) (relying on Locke and holding that state could prohibit payment of tuition vouchers to primary and secondary parochial schools without violating Free Exercise), aff'd on other grounds by 919 So. 2d 392 (2006).

Like the scholarship program in Locke, the continued denial of busing here is too minor of a burden on religion to be presumptively unconstitutional. Plaintiffs do not argue, and there is no evidence to suggest, that denial of

busing either imposed a "criminal or civil sanction" on plaintiffs or prevented plaintiffs from participating in politics.  Instead, plaintiffs argue that School District's policy required them to choose between their genuinely held religious beliefs requiring them to send their children to a parochial school and obtaining the public benefit of busing to and from school.  This contention is based upon a troika of Supreme Court cases, namely <u>Hobbie v. Unemployment Appeals Commission of Florida</u>, 480 U.S. 136, 107 S. Ct. 1046, 94 L. Ed. 2d 190 (1987), <u>Thomas v. Review Board of Indiana Employment Security Division</u>, 450 U.S. 707, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981), and <u>Sherbert v. Verner</u>, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963).

Plaintiffs' argument fails because busing to and from a private school is not a public benefit.  The First Circuit's decision in <u>Gary S. v. Manchester School District</u>, 374 F.3d 15 (1st Cir. 2004), is instructive.  In <u>Gary S.</u>, the plaintiff was a disabled child who attended a private, religious school.  Because the plaintiff attended a private school, he received less educational services than he would have if he attended public school.  Plaintiff argued that the statutes providing fewer services for students who attend private schools required the plaintiff to choose between complying with his parent's religious belief in sending their son to a parochial school and the receipt of a public benefit.

33

The First Circuit held that the educational services did not qualify as a public benefit.  First, the court noted that the Supreme Court has limited the public-benefit analysis to cases involving unemployment benefits.  See id. at 19; cf. Smith, 494 U.S. at 883-84, 110 S. Ct. 1595 (expressly limiting the rule in Sherbert to unemployment compensation context).  Additionally, the court concluded that the educational services were not a public benefit because they were not available to everyone.  Instead, Congress had earmarked some of those benefits for public school students only.  See Gary S., 374 F.3d at 19-20.  The court concluded that plaintiff had "no cognizable entitlement" to the educational services while he attended a private school, and thus, it did not violate the Free Exercise Clause to deny him those benefits.  Id. at 20.  "[I]t is clear there is no federal constitutional requirement that private schools be permitted to share with public schools in state largesse on an equal basis."  Id. at 21.

Like the educational services in Gary S., the denial of busing to plaintiffs here is not a sufficient burden to constitute a violation of the Free Exercise Clause.  Plaintiffs concede there is no general constitutional right to busing.  Additionally, busing is not a public benefit to which everyone is entitled.  Plaintiffs have presented no evidence indicating that School District provided busing to other nonpublic school students.  Further, the denial of busing here is no greater of a burden than the denial of educational services

34

to a disabled child.  In sum, because School District's policy to continue denying busing after March 3, 2003, is such a minimal burden on plaintiffs' ability to practice their religion, the policy does not violate plaintiffs' right to the free exercise of religion.

### B.    Equal Protection

Plaintiffs allege that they were deprived of equal protection under the laws as guaranteed by the First and Fourteenth Amendments of the U.S. Constitution because School District allegedly made busing available to nonpublic school students, but denied plaintiffs busing because they attended a parochial school.  Plaintiffs allege that this amounts to unconstitutional discrimination based upon religion.

"The Equal Protection Clause requires the government treat all similarly situated people alike."  Creason v. City of Washington, 435 F.3d 820, 823 (8th Cir. 2006).  As a result, plaintiffs have the burden of presenting evidence that they were "treated differently from others similarly situated."  Id.  Plaintiffs do not contend that they are similarly situated to public school students. Instead, they contend that School District cannot bus some nonpublic school students and refuse to bus them because they attend a parochial school. Plaintiffs cannot carry their burden, however, because School District does not provide busing to any other nonpublic school students.  In fact, the

evidence indicates that the only nonpublic school students to ride School District's buses were Bethesda students.

Even if plaintiffs could prove that they were treated differently from other, similarly situated persons, their equal protection claim would still fail. The Supreme Court in Locke, 540 U.S. at 720 n.3, held that an equal protection claim based upon religious discrimination only triggers strict scrutiny if the plaintiff also prevails in establishing a free exercise violation.  If there is no free exercise violation, then rational-basis review applies to the equal protection claim.  See id.

Here, as noted above, plaintiffs cannot prevail on their free exercise claim.  As a result, rational-basis review applies to School District's policy of continuing to deny busing to plaintiffs after March 3, 2003.  And as noted above, School District's policy passes the deferential rational-basis review. Plaintiffs' equal protection claim thus fails as a matter of law.

**C.    Free Speech**

Plaintiffs claim that denial of busing violates their right to free speech. Relying on Good News Club v. Milford Central School, 533 U.S. 98, 121 S. Ct. 2093, 150 L. Ed. 2d 151 (2001), plaintiffs argue that School District engaged in unconstitutional viewpoint discrimination when School District excluded them from School District's buses.  In Good News Club, the Supreme Court held that once a school board creates a limited public forum, the school board

36

cannot engage in viewpoint discrimination.  See id. at 106-07.  In this case,

however, School District has not opened the buses as either a public or a

limited public forum.  (Docket 365).  School District can thus exclude

plaintiffs without violating their right to free speech.  See Locke, 540 U.S. at

721 n.3 (denying free speech claim because the scholarship program was not

a forum for speech).

### D.    Establishment Clause

Plaintiffs allege that School District's policy of continuing to deny

busing after March 3, 2003, violated the Establishment Clause.  Specifically,

plaintiffs allege that the S.D. Constitution provisions disfavor "sectarian"

religious denominations, and that School District's enforcement of those

provisions to deny busing violates the Establishment Clause because it

amounts to denominational discrimination.  As noted above, however, School

District's continued denial of busing after March 3, 2003, was not caused by

the S.D. Constitution provisions.  Further, there is no evidence indicating that

School District granted busing to members of a different denomination or

otherwise treated them differently than plaintiffs.  As a result, plaintiffs'

establishment of religion claim fails as a matter of law.  See Larson v. Valente,

456 U.S. 228, 244, 102 S. Ct. 1673, 72 L. Ed. 2d 33 (1982) (stating

Establishment Clause prohibits government discrimination between religious

denominations).

### III.   School District and State's Motion to Strike

School District and State jointly move to strike portions of Roger Severino's declaration in support of plaintiffs' motion for summary judgment. Because the court concludes that School District and State are entitled to summary judgment even if this evidence were considered, the motion is denied as moot.

### IV.   Plaintiffs' Motion to Strike

Plaintiffs move to strike the supplemental affidavit of Vern Hagedorn. Because South Dakota and State are entitled to summary judgment even if this evidence is excluded, and because the court does not rely on this evidence, the motion is denied as moot.[8]

Based on the foregoing, it is hereby

ORDERED that School District's third motion (Docket 300) for summary judgment is granted.

IT IS FURTHER ORDERED that State's motion (Docket 309) for summary judgment is granted.

IT IS FURTHER ORDERED that State's joinder (Docket 333) of School District's third motion for summary judgment is granted.

---

[8] Plaintiffs, School District, and State each filed documents purporting to be a reply to response to statement of undisputed facts (Docket 416, 425). Because there is no authority for this filing in the local rules, see D.S.D. LR 56.1, the court sua sponte strikes both these documents and has not considered them in this ruling.

IT IS FURTHER ORDERED that plaintiffs' motion (Docket 303) for summary judgment is denied.

IT IS FURTHER ORDERED that School District's and State's joint motion (Docket 370) to strike is denied as moot.

IT IS FURTHER ORDERED that plaintiffs' motion (Docket 444) to strike is denied as moot.

Dated June 6, 2007.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE